**In re Thomas POORE, Debtor.**

**Amado PARGAS, Jr., Plaintiff,**

**v.**

**Thomas POORE, Defendant.**

**Bankruptcy No. 79–01238 R.
Adv. No. 80–0011 R.**

United States Bankruptcy Court,
D. New Mexico.

Aug. 31, 1982.

Jeffrey A. Dahl, Albuquerque, N.M., for plaintiff.

Michael L. Rosenfield, Albuquerque, N.M., for defendant.

### MEMORANDUM OPINION

STEWART ROSE, Bankruptcy Judge.

Plaintiff brings this adversary proceeding to determine the dischargeability of his wrongful death claim against the Defendant-Debtor, pursuant to 11 U.S.C. § 523(a)(6), alleging willful and malicious injury to his daughter, causing her death.

The matter came on to be heard on cross motions for summary judgment, upon the issue of dischargeability alone. The facts are not in dispute and there are no other issues of law to be determined by the Court.

Before considering the issue of dischargeability, a recitation of the proceedings and the facts which they disclose is appropriate.

Plaintiff had filed suit in a state court prior to the filing of the petition in bankruptcy by the Debtor. Rather than remove the then pending case to this Court or seek relief from the stay to proceed therewith, Plaintiff simply filed a Proof of Claim. The Trustee did not object thereto and the

Debtor, after being afforded the opportunity, chose not to do so. Thus the issues of liability and damages were resolved.

In support of his Motion for Summary Judgment, Plaintiff attached a copy of the police accident report, containing the information compiled by the investigating police officers in narrative form, and the statements obtained by those officers from the eyewitnesses. Although the statements were not verified, the parties agreed that they were susceptible to verification and that if this were done, that they would qualify as affidavits admissible in support of a motion for summary judgment. Defendant waived this lack of formality. By this procedure, the Court was permitted to understand the facts and circumstances surrounding the incident in great detail, without the necessity of a formal trial of several days duration.

Counsel should be commended for this approach to the presentation of factual issues. The time expended by court and counsel was materially reduced without any concomitant diminution in the clarity of presentation of the facts.

The facts adduced were, that the Defendant was driving his black station wagon north on Juan Tabo Boulevard in the City of Albuquerque, New Mexico, on July 26, 1978, at about 4:00 P.M. The posted speed limit was 40 miles per hour. Eyewitnesses estimated Defendant's speed at 60 miles per hour or more, substantially faster than other traffic. Juan Tabo Boulevard had three northbound lanes of traffic and a median divider. Northbound traffic was light. Defendant was observed weaving from lane to lane and bouncing off the curbs on the inside and outside lanes. Three teenage girls, including the deceased, were crossing Juan Tabo Boulevard at the intersection of Mountain Road as Defendant approached. Immediately prior to the accident they had crossed the northbound lanes of Juan Tabo Boulevard and were standing on the median in the intersection. Defendant's vehicle skidded into the lefthand turning bay of the median, jumped the median, straddling it, and slid broadside into the deceased, killing

her. Defendant's car came to rest at the northwest corner of the intersection, with both rear tires blown. Defendant then attempted to leave the scene of the accident, but was unable to go more than one-half block, because of the flat tires. He was then restrained by a bystander until the police arrived. Defendant was immediately arrested and placed in a patrol car. He was abusive, drunk and extremely combative. At the police station, he had to be forcibly subdued. Shortly after his arrival at the station, and with the continued assistance of police officers, a technician took a blood sample, which showed a 0.25 percent blood alcohol content.

The Court takes judicial notice that the Defendant was convicted of vehicular homicide in Bernalillo County District Court, that his conviction was set aside by an appellate court for error in the jury instructions, and, that having served one year, he was not retried.

The conduct of the Defendant clearly approaches the outer limits of negligence. It was certainly wanton and in reckless disregard of the lives and safety of others. Further, his conduct was well within the area where criminal punishment is appropriate. The question, however, is whether it is " . . . willful and malicious injury by the Debtor to another . . ." within the ambit of 11 U.S.C. § 523(a)(6).

The prior Bankruptcy Act of 1898, at § 17(a)(8), excepted from discharge a provable debt for "willful and malicious injuries to the person . . . of another . . .". At first blush, it would appear reasonable to interpret the identical language of the present Code in the light of cases interpreting the Act of 1898. However, the legislative history of the Code contains the following cryptic comment:

> Under this paragraph, "willful" means deliberate or intentional. To the extent that *Tinker v. Colwell,* 139 U.S. 473 (1902), held that a lower standard is intended, and to the extent that other cases have relied on *Tinker* to apply a "reckless disregard" standard, they are overruled.

H.R. No. 95–595, 95th Cong., 1st Sess. (1977) 365, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6320–6321.

Were it not for this statement of legislative history, this Court would be bound to follow the clear rule in this circuit that the injury was "willful and malicious" and therefore nondischargeable, *Den Haerynck v. Thompson,* 228 F.2d 72 (10th Cir.1955).

The weight to be given legislative history has often been the subject of conflicting views. For example, *In re Simmons,* 9 B.R. 62 (Bkrtcy.S.D.Fla.1981), suggests that legislative history should be employed only to resolve ambiguities, and that there is no ambiguity in the terms "willful and malicious". This case further argues that the terms are not ambiguous, since they were defined in the "legion of cases following *Tinker."* 9 B.R. at 66.

The opposing view, that the statute is ambiguous, and that the legislative history overrules the prior case law, was taken *In re Simmons,* 17 B.R. 259 (Bkrtcy.N.D.Ga. 1982) (involving a different debtor by the same name).

The second approach seems preferable. Although it may be desirable that terms such as "willful and malicious" should have a fixed and permanent meaning, nevertheless, Congress should be entitled to change that meaning. In the field of statutory law, the law is made by Congress, not by the Courts. The law of bankruptcy is a vehicle to carry out social policies. What those policies should be and how they should be changed lie within the domain of Congress, not the Courts.

Now that it is established that the so-called "cryptic comment" should be followed, it is appropriate to dissect it, to understand exactly what it means.

> Under this paragraph, "willful" means deliberate or intentional. To the extent that *Tinker v. Colwell,* [193] 139 U.S. 473 [24 S.Ct. 505, 48 L.Ed. 754] (1902), held that a lower standard is intended, and to the extent that other cases have relied on *Tinker* to apply a "reckless disregard" standard, they are overruled.

To establish with precision what the comment does say, it is appropriate to consider what it does not say. It does not say anything about the term "malicious". Therefore, nothing said in *Tinker* relating to the term "malicious" is either overruled or affected. The Supreme Court's assessment that the conduct of Mr. Colwell was malicious toward Mr. Tinker in his criminal conversation with Mrs. Tinker remains intact.

What the comment does say is that "willful" means deliberate or intentional. The "reckless disregard" standard is overruled. Willful does not mean reckless disregard.

*Tinker* involved the question of dischargeability of a prior judgment against the bankrupt for criminal conversation with the plaintiff's wife. Mr. Justice Peckham, speaking for the majority, concluded that the defendant's intercourse with the plaintiff's wife was an intentional tort, a trespass *vi et armis* which damaged the plaintiff's property rights in his wife's society.

> We think the authorities show the husband has certain personal and exclusive rights with regard to the person of his wife which are interfered with and invaded by criminal conversation with her; that such an act on the part of another man constitutes an assault even when, as is almost universally the case as proved, the wife in fact consents to the act; because the wife is in law incapable of giving any consent to affect the husband's rights as against the wrongdoer, and that an assault of this nature may properly be described as an injury to the personal rights and property of the husband, which is both malicious and wilful. A judgment upon such a cause of action is not released by the defendant's discharge in bankruptcy.

> The assault *vi et armis* is a fiction of the law, assumed at first, in early times, to give jurisdiction of the cause of action as a trespass, to the courts, which then proceeded to permit the recovery of damages by the husband for his wounded feelings and honor, the defilement of the mar-

riage bed, and for the doubt thrown upon the legitimacy of children.[1]

193 U.S. at 481, 24 S.Ct. at 506.

The act complained of was intercourse with the wife of another. The Supreme Court said that the consent of the wife was immaterial, that she was incapable of giving consent, and that the act was wrong. Reasoning therefrom, it would appear that there could never be a situation where having intercourse with the wife of another could be right or permissible.

In this case the conduct complained of was that the Defendant drove an automobile. True, he drove it while drunk, and in an extraordinarily reckless manner. However, driving a car is not inherently wrong. The distinction to be drawn between intentional and negligent torts is thus the distinction between those acts which are always wrong and those which are wrong because of the way in which they are done.[2]

The fundamental distinction therefore made in *Tinker* between intentional and negligent torts would obviously appear to remain good law. This is the case even if the facts on which these distinctions were made may no longer be quite consistent with present social mores. Parenthetically, it is reputed in this District that the last case of alienation of affections, which occurred a number of years ago, resulted in a jury verdict in favor of the plaintiff in the sum of two cents.

Further discussing the distinction between negligent and intentional torts, *Tinker* distinguishes negligent driving as compared to the use of an automobile for an intentional assault, suggesting that the first is not intentional and therefore dischargeable, which the second is intentional and therefore non-dischargeable. Although this comparison may be couched in terms of malice, i.e. state of mind, nevertheless, the distinction is sharp and well-drawn.

Having concluded that *Tinker* stands for the proposition that "willful" means deliberate and intentional, there is no disagreement between the case holding and the statement in the legislative history that "willful" means deliberate and intentional. Yet, the legislative history continues:

> To the extent that *Tinker v. Colwell* . . . held that a looser standard is intended . . . then [it] is overruled.

Since *Tinker v. Colwell* did most specifically not intend a looser standard, then it is perplexing to reconcile this suggestion that it did. The resolution of the matter, however, lies in the quantifying verbage: "To the extent . . ." Translated, this means: insofar as *Tinker v. Colwell* is misperceived to hold that willful means anything less than deliberate and intentional, this perception is incorrect. The proposition is further borne out by the complete sense of the sentence from which it is taken:

> "To the extent that *Tinker v. Colwell* held that a lesser standard is intended, *and to the extent that other cases have relied on Tinker to apply a "reckless disregard" standard, they are overruled.*" (Emphasis supplied).

Again translating, the foregoing complete sentence means: *Tinker v. Colwell* did not establish a "reckless disregard" standard, but if it did, it is overruled; any case which relies on *Tinker* as support for equating reckless disregard with willfulness is also overruled.

It would appear that Congress was seeking not to overrule *Tinker v. Colwell,* but the interpretation placed thereon by subsequent decisions. At this point it would appear a simple task to decline to follow the controlling decision in this circuit, *Den Haerynck v. Thompson,* 228 F.2d 72, supposing that it purported to follow *Tinker.* However, *Den Haerynck,* while quoting *Tinker* in support of its decision on the question of malice [3], refused to follow its

---

1. For a discussion of the consequences of "tinkering" with Mrs. Tinker, see Countryman, *The New Dischargeability Law,* 45 Amer.Bank. L.J. 12–16.

2. For an excellent discussion of this distinction, see the opinion of Johnson, B.J. in *In re Rainey,* 1 B.R. 569 (Bkrtcy.Or.1979).

3. And "In order to come within that meaning as a judgment for a wilful and malicious injury

dicta on the question of willfulness involving the operation of an automobile. In fact, *Den Haerynck* said that the cases were decisively different.[4]

Since *Den Haerynck* is not the prodigy of *Tinker* the legislative history does not overrule it and this Court should follow it as controlling precedent, unless the legislative history requires a different result. Indeed such is the fact; the first sentence of the legislative history says:

"Under this paragraph, "willful" means deliberate and intentional."

The holding in *Den Haerynck* that "willful" means "reckless operation of an automobile and wanton disregard of the rights of others" is overruled.

It is useless to speculate why Congress did not simply describe as non-dischargeable, debts for deliberate or intentional and malicious injury. The matter may be resolved or at least made moot by a bill introduced in the Senate (S.B. 5.2159, 97th Cong., 2d Sess. March 2, 1982) making claims arising from accidents of drunk drivers non-dischargeable. The decision thus arrived at, that the claim here in question is dischargeable because the tort was negligent rather than intentional, is in accord with the cases interpreting the new Bankruptcy Code. *In re Bryson,* 3 B.R. 593 (Bkrtcy.Ill.1980), *In re Donnelly,* 6 B.R. 19 (Bkrtcy.Or.1980), *In re Naser,* 7 B.R. 116 (Bkrtcy.Wis.1980), *In re Ankowiak,* 9 B.R. 746 (Bkrtcy.Ill.1981), *In re Stanfield,* 14 B.R. 180 (Bkrtcy.Ohio 1981). Uniformity of interpretation of the new Code is thus preserved, by virtue of the "cryptic comment" in the legislative history.

It is the decision of the Court that the claim of the Plaintiff against the Defendant is discharged in bankruptcy and that

to person or property, it is not necessary that the cause of action be based upon special malice, so that without it the action could not be maintained." 228 F.2d at 74.

4. "In an effort to sustain the crucial provision in the order granting discharge from liability upon the judgment in favor of the father of the deceased minor, the bankrupt relies heavily upon *Tinker v. Colwell,* supra. But that case was decisively different. It involved the ques-

this cause should be dismissed with prejudice. An appropriate Order will be entered.

tion whether a judgment for damages for criminal conversation represented a non-dischargeable liability for willful and malicious injury to the person or property of another. It did not involve the question of dischargeability of a judgment for damages for injury to the person of another arising out of the reckless operation of an automobile upon a public thoroughfare in wanton disregard of the rights of others." 228 F.2d at 75.